IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **DEBBIE GHOREYAN-WHITE,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 14-cv-615-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| Acting Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Debbie M. Ghoreyan-White, through counsel, seeks review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB).

**Procedural History**

Plaintiff applied for benefits on June 8, 2011, alleging disability beginning on February 16, 2011. (Tr. 14). After holding an evidentiary hearing, ALJ Carol L. Boorady denied the application for benefits in a decision dated November 9, 2012. (Tr. 14-24). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

**Issues Raised by Plaintiff**

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).  See, Doc. 21.

Plaintiff raises the following points:

1. The ALJ improperly discounted the opinion of plaintiff's treating physician.

2. The ALJ did not properly evaluate plaintiff's credibility.

### **Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is

2

> considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

**Weatherbee v. Astrue, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **20 C.F.R. §§ 404.1520; Simila v. Astrue, 573 F.3d 503, 512-513 (7th Cir. 2009); Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984). See also Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001)**(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant

reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See,** ***Books v. Chater*****, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*****, 55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*****, 91 S. Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*****, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*****, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

4

ALJ Boorady followed the five-step analytical framework described above. She determined that plaintiff had not been engaged in substantial gainful activity since her alleged onset date. She found that plaintiff had severe impairments of degenerative disc disease of the lumbar spine, lumbar spondylosis with moderate bilateral neural foraminal stenosis, and degenerative changes in both knees. (Tr. 16). The ALJ found that plaintiff had the residual functional capacity to perform work at the sedentary level with physical limitations. (Tr. 18). Based on the testimony of a vocational expert the ALJ found that plaintiff was unable to perform past relevant work, however she was able to perform work that existed in significant number in the regional and national economies. (Tr. 22-23).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born on April 17, 1965 and was forty-five years old at her alleged onset date. (Tr. 196). She was insured for DIB through December 31, 2014. (Tr. 238). Plaintiff was five feet five inches tall and weighed three hundred and seven pounds. (Tr. 201).

According to plaintiff she had a number of health problems that made her unable to work including bulging disc disease, degenerative disc disease, plantar fasciitis on right foot, and right knee problems. (Tr. 201).

Plaintiff previously worked as a certified nurse's aide, housekeeper, laborer for a temp agency, and a security guard. She had a cosmetology degree and completed two years of college. (Tr. 202).

In a Function Report submitted in June 2011, plaintiff stated she lived in an apartment with her family. (Tr. 222). She performed simple chores such as making the bed, light house cleaning, and laundry. (Tr. 222, 224). She was able to drive and shopped for food once a month. (Tr. 225). Plaintiff could handle financial matters and make simple meals. (Tr. 224-25).

Plaintiff stated she had trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks, and concentrating. She felt she could walk for one block before needing a twenty minute rest. (Tr. 227).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on November 1, 2012. (Tr. 30). She was forty-seven years old at the time of the hearing and she lived with her husband and her seventeen year old son. (Tr. 34). She stated she had a driver's license but her son drove her to the hearing because she did not drive frequently. (Tr. 35).

Plaintiff testified that she last worked full-time in February 2011 as a security guard. She was fired because she could no longer perform the work

and missed too many days due to medical problems. (Tr. 36). Plaintiff had a part-time job at a school cafeteria where she scooped and served ice cream. (Tr. 38-39). She served the ice cream in four fifteen minute intervals during each weekday. (Tr. 40). She was able to sit in a back room when she was not serving the children. (Tr. 41-42). Plaintiff did not consult her physician before beginning the part-time work, but she stated that her son needed new clothing so she had to get a job. (Tr. 47-48).

Plaintiff testified that pain in her knees made her unable to perform jobs where she needed to sit for most of the day. She felt that nothing relieved her pain except lying down. (Tr. 38). She stated that walking, sitting, and standing were equally painful and she experienced little relief from the treatments she received. (Tr. 42-43).

Plaintiff testified that she took high blood pressure medication, several pain killers, and a muscle relaxer. She also received cortisone injections in her knees. (Tr. 43). She stated that she had injections, went to a pain management specialist, and did physical therapy for her back pain. None of those treatments helped and her only remaining option was surgery. (Tr. 44). However, she could not have surgery until she lost weight. (Tr. 45).

Plaintiff stated that she does not lift over five pounds and does not sit or stand for more than fifteen minutes at a time. (Tr. 45-47). She spent most of the day laying down and watching television or using her laptop. (Tr. 49-50). She had a difficult time walking up and down stairs and had poor balance. (Tr. 50-51).

A vocational expert (VE) also testified. The ALJ asked the VE hypothetical questions that comported with the ultimate RFC assessment, that is, a person could lift or carry less than five pounds frequently, up to five pounds occasionally, and stand or walk for two hours out of an eight hour work day. Additionally, the person could sit for up to six hours a day and must have the ability to alternate between sitting and standing positions at will but could remain at the work station when alternating positions. The person could never bend, kneel, crouch, crawl, or climb ladders, ropes, scaffolding or stairs, and can stoop no more than occasionally. (Tr. 58).

The VE testified that plaintiff could not perform her past work or any work at the unskilled level. (Tr. 58). However, other semi-skilled and skilled jobs existed in significant numbers in the national economy. Examples of such jobs are telephone solicitor, receptionist, and order clerk. (Tr. 58-61). The VE also stated that plaintiff's inability to lift more than five pounds would reduce the number of available sedentary jobs by about fifty percent. (Tr. 64).

### 3. Medical Treatment

In September 2010, plaintiff presented to her primary care physician's office complaining of increased right foot pain in her Achilles area. She was doing exercises for plantar fasciitis but they had not helped. (Tr. 379-80). Plaintiff's primary doctor, Dr. Sarah Calhoun, referred plaintiff to a foot and ankle specialist, Dr. Saul Trevino. (Tr. 280).

In November 2010, plaintiff saw Dr. Trevino due to her problems with Achilles tendinitis and plantar fasciitis. She had normal strength and sensation

but her plantar fascia was tender. She stated her symptoms had bothered her since June 2009. (Tr. 280-81). Plaintiff returned to Dr. Trevino in December 2010 for a follow-up. She had a very antalgic gait and had difficulty walking. Dr. Trevino noted plaintiff was tender on the posterior aspect of her heel and over the lateral aspect of her Achilles tendon. He had her fitted with a Cam boot and custom-made arch supports in order to alleviate her pain. (Tr. 285-87).

Plaintiff's next medical treatment on record was in June 2011 when she presented to Dr. Calhoun with left leg and knee pain. While she had surgery on her knee several years prior, her knee had not bothered her until a week before this visit. (Tr. 370). Plaintiff had an MRI performed on her knee later that month. The MRI showed edema suggestive of chronic repetitive strain, findings suggestive of a grade 1 medial collateral ligament sprain, and degeneration at the posterior horn of the medial meniscus. (Tr. 272). Plaintiff was referred to specialist Dr. Thomas Aleto for her knee pain. He felt her MRI indicated no substantial meniscal pathology but she did have degenerative changes. Dr. Aleto began giving plaintiff cortisone injections to help with her pain. (Tr. 275).

In January 2012, plaintiff had another MRI of her left knee performed. The imaging revealed degenerative tearing of the medial meniscus, tricompartmental arthrosis most pronounced in the patellofemoral and medial meniscus, and small joint effusion. (Tr. 345-46).

In April 2012, plaintiff saw a podiatrist, Ben Sommerhays, DPM, for her right foot problems. (Tr. 314). Plaintiff was performing her stretching exercises

at home and taking Mobic for pain without any relief. Dr. Sommerhays noted that plaintiff's insurance did not cover physical therapy so she was given at home exercises and cortisone injections. (Tr. 315).

Plaintiff returned to Dr. Calhoun in April 2012 with back pain that radiated down both of her legs into her heels. (Tr. 357). While Dr. Calhoun noted that plaintiff's spine was not tender to palpation, she also stated the pain was chronic and worsening. Dr. Calhoun ordered an MRI, added Flexeril to her prescriptions, and referred plaintiff to an orthopedic doctor. (Tr. 359). Later that month, plaintiff saw Dr. Khuns at the Missouri Orthopedic Institute for her back pain. (Tr. 302-09).

Plaintiff had seen Dr. Khuns for several years and treatment notes indicated plaintiff's pain had worsened since her visit one year prior. Plaintiff presented with new X-rays and MRI imaging. (Tr. 306). The MRI report from the imaging center noted no significant changes since the 2008 study. (Tr. 311). Dr. Khuns compared the MRIs and noted there was evidence of some generalized spondylosis predominately at L5-S1 with some loss of disc height and anterior spurring. He also stated there was consistent loss of disc height with disc bulging of L5-S1 with lateral foraminal stenosis bilaterally. (Tr. 308).

Dr. Khuns noted that plaintiff had exhausted conservative treatment options and that plaintiff was a good candidate for surgery. However, plaintiff would need to lose approximately seventy-five pounds due to her morbid obesity to proceed with the surgical option. (Tr. 308).

In May 2012, plaintiff presented to Dr. Calhoun with back pain and numbness and tingling in her legs when they were extended. (Tr. 348-55). Plaintiff had trouble lifting and preferred to lie down on her side to alleviate pain. (Tr. 353). Plaintiff saw Dr. Aleto once more in October 2012 for her knee pain. (Tr. 385-86). Plaintiff had injections and Dr. Aleto noted plaintiff's X-rays "demonstrate fairly advanced degenerative changes in the medial compartment and patellofemoral." (Tr. 386). Plaintiff had restricted motion with grinding and swelling. (Tr. 385-86).

### 4. Opinion of Treating Physician

Dr. Calhoun completed mental and physical medical source statements in May 2012. While she opined that plaintiff had no mental impairments on record, she also determined plaintiff had several physical limitations. (Tr. 339-45). Dr. Calhoun stated that plaintiff should lift a maximum of five pounds per day, and stand, walk, or sit for fifteen minutes at a time and less than one hour total per day. Plaintiff also would need a fifteen minute break every fifteen minutes in order to lie down or recline to alleviate symptoms during an eight-hour workday. (Tr. 342-43). Dr. Calhoun opined that plaintiff should avoid any exposure of heights or hazards, and avoid moderate exposure of extreme heat, cold, weather, wetness and humidity, and vibration. (Tr. 343).

## Analysis

Plaintiff first argues that the ALJ incorrectly discounted Dr. Calhoun's opinion. The ALJ looked at Dr. Calhoun's physical medical source statement and gave it "little weight." The ALJ is required to consider a number of factors

11

in weighing a treating doctor's opinion. The applicable regulation refers to a treating healthcare provider as a "treating source." The version of 20 C.F.R. §404.1527(c)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski*, 245 F.3d at 881.** Supportability and consistency are two important factors to be considered in weighing medical opinions. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." ***Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).**

The ALJ looked at Dr. Calhoun's treatment notes indicating plaintiff could stand, walk, or sit for fifteen minutes at a time and no more than one hour per day and needed frequent fifteen minute breaks in order to lie down. (Tr. 342-43). The ALJ gave this opinion little weight because Dr. Calhoun's

12

"treatment notes do not support the extreme limitations in the assessment," the ALJ felt the opinion was based on plaintiff's less than credible complaints, and the form was in a checkbox format that did not reference support for Dr. Calhoun's conclusions. (Tr. 21).

While plaintiff contends that the ALJ erred by not analyzing every factor for a treating physician's opinion, this is not necessarily true. The Seventh Circuit has held that an ALJ's reasoning can be sufficient even if it only covers two of the factors outlined in 20 C.F.R. § 404.1527(d). **Henke v. Astrue, 498 Fed.Appx. 636, 640 (7th Cir. 2012).** However, while the ALJ is only required to minimally articulate her reasons for rejecting evidence, the reasoning has to be sound. **Berger v. Astrue, 516 F.3d 539, 545 (7th Cir. 2008); Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011).** Here, the Court agrees with plaintiff that ALJ Boorady's analysis is insufficient.

First, the ALJ states that the treatment notes only reference diffuse lumbar tenderness and positive straight leg raising. (Tr. 21). This is only one portion of Dr. Calhoun's notes. Plaintiff saw Dr. Calhoun regularly for over two years and Dr. Calhoun's records indicate plaintiff had degeneration and displacement of lumbar discs, osteoarthritis, and spinal stenosis among other problems. (*Ex.*, Tr. 314, 319-21, 360, 380). Through her explanation, it seems the ALJ only considered one treatment note in conjunction with the medical source statement and not plaintiff's overall history with Dr. Calhoun. Her explanation as to why she gave Dr. Calhoun's opinion little weight does not

13

reference any other medical records nor does it provide much explanation based on the one record she referenced. This is error.

The Commissioner references medical records on file to support the ALJ's determination that Dr. Calhoun's medical source statement was based on subjective complaints. However, the ALJ did not reference these medical records, and explicitly stated she looked at the contemporaneous opinion to determine it was based on subjective complaints. In advancing reasons not relied upon by the ALJ, the Commissioner violates the *Chenery* doctrine. See, **SEC v. Chenery Corporation, 318 U.S. 80 (1943).** "Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." **Kastner v. Astrue, 697 F.3d 642, 648 (7th Cir. 2012).**

In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with her conclusion. **Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009).** While she is not required to mention every piece of evidence, "[she] must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." **Godbey v. Apfel, 238 F.3d 803, 808 (7th Cir. 2000).** The ALJ impermissibly "cherry-picks" plaintiff's records in order to support her finding that plaintiff is not disabled throughout her opinion.

For example, the ALJ also focuses heavily on the one treatment note that indicated plaintiff's MRI from 2008 was similar to the imaging done in 2012. (Tr. 19-20, 311). She fails, however, to note that the reviewing doctors indicated

plaintiff had degenerative changes and significant disc narrowing in the more recent MRI. (Tr. 308). The ALJ also notes that plaintiff did not need assistance to walk, but does not acknowledge when doctors stated she had a severe antalgic gait and difficulty walking. (Tr. 19, 285-87).

Additionally, an ALJ is not permitted to "play doctor" and her decision "must be based on testimony and medical evidence in the record, and not on [her] own 'independent medical findings.'" ***Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).** It seems as though that is what ALJ Boorady did with the case at hand. For example, the ALJ noted that the diagnostic imaging of plaintiff's knees revealed slightly progressive moderate arthritic and degenerative changes as well as bilateral medial joint space narrowing with degenerative bony spurs of the femoral condyles. She then states that plaintiff did not have any abnormal medical signs due to these problems. (Tr. 19). Plaintiff regularly saw doctors regarding the pain she experienced in her knees, received cortisone injections, and previously had surgery. (*Ex.*, Tr. 43, 275, 370). No doctors on record indicate plaintiff did not have the level of debilitating pain she claimed to experience, nor did they indicate she had greater capabilities than Dr. Calhoun provided in her statement.

Finally, in light of the ALJ's decision to give Dr. Calhoun's opinion "little weight" it is unclear how she determined plaintiffs RFC. As plaintiff points out, the ALJ did not call a medical expert or send plaintiff for a consultative examination. The only medical opinion on record is that of Dr. Calhoun which the ALJ gave little weight. When Dr. Calhoun's opinion is excluded from the

15

record the Court is unable to identify evidence the ALJ relied upon to determine plaintiff could perform sedentary work. "An ALJ cannot substitute his own judgment for a physician's opinion without relying on other medical evidence or authority of record." **Clifford, 227 F.3d at 870.**

The ALJ is "required to build a logical bridge from the evidence to [her] conclusions." **Simila v. Astrue, 573 F.3d 503, 516 (7th Cir. 2009).** While the ALJ was not required to give Dr. Calhoun's opinion controlling weight, she needed to adequately explain why the opinion was discounted. ALJ Boorady simply failed to do so here. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." **Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012)., citing Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).** While the ALJ

It is not necessary to address plaintiff's other points at this time. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Debbie Ghoreyan-White application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: May 19, 2015.**

<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**